UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN MORZINE                                    CIVIL ACTION

-vs-                                            DOCKET NO.

PHILADELPHIA HOUSING AUTHORITY
JOANN STRAUS, AND BRANVILL BARD                 TRIAL BY JURY DEMAND

COMPLAINT

## I.   INTRODUCTION

1.   Plaintiffs bring this civil action pursuant to 42 USC §1983, for the deprived of

Plaintiff's rights, by the defendants acting under color of state law, policy practice and

custom.

2.   The deprivation by the defendants is to the Plaintiff's First and Fourteenth

Amendment rights.

3.   The First Amendment right to speech and association. The Fourteenth

amendment right is to procedural due process and equal treatment as secured by the

United States Constitution or law, rule, or regulation.

4.   The conduct by the defendants is to deny equal treatment because of race and/or

gender. The deprivation is to procedural due process before and in the termination

from employment with PHA by defendants Bard and Strauss.

5.   Plaintiff had a protected property interest in the PHA employment under state

law and a Collective Bargaining Agreement; each providing the Plaintiff could not be

1

terminated, suspended or reduced in pay or grade without cause and a  pre-employment or wage loss, known as a Loudermill hearing process.

6.   Plaintiff is terminated by Straus and Bard for, inter alia, speaking out against and an opposition to employment discrimination, because of race, by supervisors that were motivated to discipline while PHA police officers unequally for the same or similar conduct  and PHA practice policy or procedure to disparately impose discipline against whites or because of race.

7.   Plaintiff is terminated as employment discrimination and retaliation because of his and but for his race, gender, and rejecting the advances of a personal sexual relationship by PHA Human Resource Director Joanna Strauss and Bard's effort to reduce the white police workforce with African-Americans and through the disciplinary process.

8.   Plaintiff brings a civil action under 42 USC 1981 for conduct not done by the defendants under color of state law,  which conduct deprived the Plaintiffs of equal protection and procedural due process rights because of race or gender; as the rights are secured by Law, United States Constitution, and Rule or Regulation.

9.   Plaintiff brings a civil action pursuant Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e, et seq.), the Pennsylvania  Human Relations Act ("PHRA" 43 P.S. §§ 951-963, et seq.), and their amendments thereto. These actions are for the creation of a hostile work environment, harassment, retaliation, and discrimination in the terms and conditions of employment because of race or gender.

10. Plaintiffs filed a charge of employment discrimination with the EEOC. The charge is duel filed and sent to the PAHRC by the EEOC. Plaintiff for nearly two years has remained in the agencies to allow the agencies to complete their duties under the law.

11. On April 5, 2018, the Plaintiff in writing requested from the EEOC it issues to plaintiff a Right to Sue Letter.

12. Plaintiff has exhausted administrative remedies.

13. Plaintiffs filed for arbitration under state law; he sought arbitration under the law, such as but not limited to Act 111 et. seq. Thereafter and but for that charge of employment discrimination, or Plaintiffs' labor activity and/or association as a PHAPD union member (as the term association and union is intended under the First Amendment to the United State Constitution, law rule or regulation), Bard and PHA retaliated against Plaintiff for the association and/or protected activity. Viz, opposing employment discrimination because of race. Speaking out on a public matter to oppose employment discrimination by public entities and public employer, and filing a charge of employment discrimination with the EEOC and PA Human Retaliations Commission. Associating with a Union and Union members. Finally, bringing and pursuing arbitration for and on a grievance with PHA a governmental entity.

14. Plaintiffs seek all relief the law provides to f make-whole the Plaintiff for discrimination in employment and/or a denial of rights, including First and Fourteenth amendment rights.

15.  Plaintiffs seek relief to include but not limited to compensatory, consequential, nominal, and punitive damages; Plaintiff seeks an award of reasonable attorney fees and litigation costs. Plaintiff seeks equitable relief such as an injunction directing return to employment and award of lost benefits from the discrimination, with the restoration of seniority and all employment benefits that would have been earned and accumulated to date, as if the benefit was never used or Plaintiff' terminated.

16. Plaintiff seeks declaratory relief, such as but not limited to a declaration of an unconstitutional or illegal procedure, practice, or conduct under law or constitution that s jury's finds from the defendants' conduct as illegal employment discrimination.

II.    PARTIES

17. JOHN MORZINE, is a natural person, Causation male, and resides within the venue of the United States District Court for the Eastern District of Pennsylvania.

18. PHILADELPHIA HOUSING AUTHORITY (PHA hereafter) is an incorporated municipal entity known as an Authority; it originally was established in 1937.

19.  PHA operates in the City of Philadelphia; it specifically operates at 12 S 23rd Street, Philadelphia PA 19103, which is within the venue of the United States District Court for the Eastern District of Pennsylvania.

20. BRANVILL BARD (defendant Bard hereafter) is a natural person. He is an African American male over the age of eighteen. For all times related to the conduct attributed to him, below described in detail, he resided within the venue of the United States District Court for the Eastern District of Pennsylvania. His current address is different now; he resides in or about Cambridge, Massachusetts.

4

21. For all times related to the Plaintiff's causes of action, defendant Bard acted as a supervisor, management, chief of police of the PHA police department, policy and decision maker for PHA, and as Plaintiffs' supervisor. Bard is an ultimate decision-maker within PHAPD and Bard made and/or controlled policy, procedure, and customs for PHAPD.

22. Bard, for all times material to the Plaintiff's causes of action, is the highest supervisor over all police officers within PHAPD. Bard controlled the Plaintiffs' work, duty assignments, and daily earnings of pay and benefits.

23. Bard, for all times material to the Plaintiff's causes of action, is a "supervisor" with PHA. Bard is a "Person" that "acted under color of state law" as these terms are intended by law. Such as but not limited to the Civil Rights Act of 1964, Title VII, Sec. 1981 and 1983, and Title VII, Sec. 1981 and 1983, and the Pennsylvania Human Relations Act ("PHRA" 43 P.S. §§ 951-963, et seq.).

24. JOANNE STRAUSS (hereafter defendant Strauss) is a natural person, female, over the age of eighteen, of the African American race, and for all times related to the conduct attributed to her below resided within the venue of the United States District Court for the Eastern District of Pennsylvania; if her current address is different as described her address is unknown to Plaintiffs.

25. For all times related to the Plaintiff's causes of action, defendant Strauss' conduct as described in detail below was as a supervisor and to the Plaintiff. Strauss controlled Plaintiffs' work and duty assignments, pay, and benefits. Strauss is a "supervisor" with PHA. She was the Human Resource Director for PHA. Strauss is a "Person" that "acted

under color of state law," as these terms are intended by law. Such as but not limited to

the  Civil Rights Act of 1964, Title VII, Sec. 1981 and 1983, and Title VII, Sec. 1981 and

1983, and Pennsylvania  Human Relations Act ("PHRA" 43 P.S. §§ 951-963, et seq.).

**III.     FACTS RELEVANT TO CAUSES OF ACTION**

26. Plaintiff by incorporation repeats all preceding paragraphs here as if repeated

verbatim.

27.  On or about February 2013, PHA hired the Plaintiff as a PHA police officer.

28. Plaintiff was certified under state law (Act 120,) by the Municipal Police Officers

Education and Training Commission (MPOETC) as a municipal police officer.

29. On or about 2014 the plaintiff was elected present of the PHA Union by PHA

Union police offices.

30.  On or about 2016, PHA hired defendant Bard as the police chief and/or Public

safety director of the PHA Police Department (hereafter PHAPD).

31. Prior to the PHA hiring, Bard served in numerous positions for the City of

Philadelphia's Police Department, including such positions as Police Inspector and

Police Captain for the 22nd District. Bard claims to hold a Doctorate in Public

Administration from Valdosta State University.

32. Bard's PHA contract is for three years with a starting salary of $210,125 (

$205,000 base salary with a 2.5% cost of living increase that went into effect July 1).

33. Upon Bards hire at PHA, he "inspected" the rank-and-file (officers) at PHA. Bard,

during the inspection, said words to the effect that "there needs to be more color here"

(speaking of the rank-and-file make up being mostly white police officers).

6

34. At the time of Bard's hire, Plaintiff was a union member, union officer, viz President, and a seasoned PHAPD police officer.

35. Prior to Bard's hiring by PHA, the plaintiff received six accommodations for is police performances as a PHA police officer.

36. After Bard's hiring, the plaintiff was recommended for accommodation but denied the accommodation for police performance on Bard 's decision. However, at the same time  African-American officers performing the same service as the plaintiff was accommodated for that service on Bard's decision.

37.  Plaintiff had satisfactory performance evaluations. Plaintiff had no significant disciplinary history, and the plaintiff was not told his performance was in need of correction, more training, and/or insufficient to continue employment.

38. After Bard was hired, he observed the rank and file of the police department, viewed its officers, and said: "more color was needed."

39. After Bard was hired, on his recommendations, 21 new police officers were hired by PHA.

40. Of the 21 new officers, 18 were African-American.

41.  Following Bard's comment that more color is needed, White PHA police officers were subjected to disproportional (more severe) discipline, including termination.

42. The discipline by Bard was adopted, approved, and acted on by defendant and Strauss.

43. The same conduct alleged done by the white police officers was also done by African American PHA police officers. However, the African-American officers were not treated the same and more favorably. Some not disciplined or terminated.

44. The discipline by PHA, Bard, and Straus is disproportional between whites and black officers, with more whites being subjected to termination or more severe discipline than black officers for the same conduct by the same decision makers, which were Strauss and Bard.

45. At the time when Bard made the comment that more color was needed, the discipline increased against whites.

46. Defendant Strauss was aware of the discipline and of the complaints that the discipline was racially motivated. Indeed, Plaintiff and other PHA officers told Strauss this. One other PHA officer was glen Eskridge., who after making the complaint was demoted from inspector to sergeant.

47. In addition to PHA Police Inspector Glen Eskridge, Police Chief Mitchell reported to Straus that there was a race-based discipline practice. Strauss was told the PHA disciplinary process was being used by African American police supervisors to disproportionally discipline white PHA police officers for conduct African American PHA police officers committed but were either not disciplined for or received less severe punishment as white PHA police officers.

48. Eskridge and Mitchell exclaimed to PHA and Strauss that the disproportional use of discipline against white offices by African-American supervisors is illegal employment discrimination.

8

49. PHA terminated Mitchell after his complaint. PHA and Strauss investigated Eskridge, after that demoting Eskridge from Inspector to Sergeant, reducing his pay, after the opposition to perceived employment discrimination.

50. PHA then hired Bard to replace Mitchell.

51. In addition to plaintiff reporting employment discrimination, he too reported to PHA the thefts by union officers of union funds

52. It was not Plaintiff's employment duty to report to PHA a theft of union funds by a union officer that is also a PHA employee.

53. Joann Strauss directed that there be no PHA PD or office of accountability investigation into the theft of union funds by the union officials.

54. In or about August 2015 the plaintiff was promoted to lieutenant and his pay to increase.

55. Plaintiff observed that PHA had not paid him the due increase to his pay by the promotion; it appeared plaintiff was shorted $4,000 that he was due by PHA.

56. The plaintiff in or about 2016 reported the wage payment shortage to Human Resources and PHA PD. The Plaintiff requested payment and compliance with wage laws. Strauss is the Director of Human Resource; Bard in-charge of PHA PD.

57. A week after reporting the pay error, and a promise by PHA HR personnel (Zach Rodgers) that payment would be made to plaintiff by PHA, the plaintiff was called into the office, and Bard terminated the plaintiff. The termination papers were signed by Straus.

58. The reason for the termination is suspect and pretextual.

59.  Bards told the Plaintiff the reason for the termination is a loss of faith as a leader in the plaintiff by him (Bard). The termination is approved by Strauss. The termination occurs in short period and suspects conditions of plaintiff's complaints about thefts, wage law violations, and illegal employment discriminations. The Collective Bargaining Agreement PHA has with PHA Police union, and state law, allow for termination but only for a good cause and after pre-disciplinary Loudermill due process is provided.

60. Plaintiff was not afforded pre-disciplinary Loudermill due process. Loss of leadership ability is not good cause to terminate employment.

61. The Plaintiff is a "Person" and/or "employee" as the terms are  intended by law, such as but not limited to the  Civil Rights Act of 1964, Title VII, Sec. 1981 and 1983, and state law, such as  the Pennsylvania  Human Relations Act ("PHRA" 43 P.S. §§ 951-963, et  seq.).

62. Plaintiffs in good faith opposed employment discrimination in their employment at PHA.

63. Plaintiff's opposition to employment discrimination is and was known by the defendants' they also knew of Plaintiff's association with and members of the PHAPD Police Officers' FOP Union ("PHAPDFOP').

64. Plaintiffs filed a charge of employment discrimination that is against PHA, Bard, Strauss.

65. Plaintiff aided other PHA officers to oppose employment discrimination, such as but not limited to Glen Eskridge,  Jackie Hempshire, and Christian  Jablonski.

66. Plaintiff cooperated in PHA EEO investigation of employment discrimination. Plaintiff provides information adverse to PHA, Bard, and Strauss in the investigations.

67. Plaintiffs' employment discrimination charge is made within the time allowed by law to make a charge with the EEOC and/or PAHRC.

68. Plaintiff filed collective bargaining grievances for being terminated from employment with PHA and PHAPD. The grievance and arbitration demand were made within the time allowed by law, under the practice and procedures as used under the collective bargaining agreement between PHA and PHAPD union/ FOP.

69. PHA operates using powers and authority conferred or provided to it under the law, state law, and/or the City of Philadelphia, its ordinance and Home Charter Rule, and to "AUTHORITIES."

70. PHA is a "person" and "employer, " as the term(s) is/are intended by law, such as but not limited to the  Civil Rights Act of 1964, Title VII, Sec. 1981 and 1983, and state law, such as  the Pennsylvania  Human Relations Act ("PHRA" 43 P.S. §§ 951-963, et seq.).

71. PHA is the nation's fourth largest public housing authority. PHA operates more than 14,000 housing units in the City of Philadelphia, serving nearly 80,000 Philadelphians. PHA operates in conjunction with the City of Philadelphia and as an agency of the PENNSYLVANIA HOUSING AUTHORITY and the UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT.  PHA is known to use the name and to operate as the CITY OF PHILADELPHIA HOUSING ADMINISTRATION.

11

72. PHA operates a uniformed police force that is independent to the uninformed and non-uniformed police force for the City of Philadelphia Police Department. PHA police personnel may "laterally" transfer ( move to) employment or position within the City of Philadelphia, to include its Police Department, without loss of pension and/or employment seniority accumulated while with PHA.

73. Plaintiff successfully completed the hiring process of PHA and became a sworn uniformed employee or police officer with PHA and its Police Department. Thereafter, Plaintiffs became a covered employee under a collective bargaining agreement between PHA and the police officers' union; they became members of the union.

74. Plaintiff, while employed with PHA, was qualified for the employment and position under PHA criteria and the Commonwealth of Pennsylvania's municipal police officer education training law (MPOETC). Also known as Act 120 (42 Pa C. S. §8951 et seq.).

75. The CBA between PHA and the PHAPD union members, which included Plaintiffs, provides, inter alia, employment cannot be ended, affected by discipline, or lost, nor can grade or wages decreased without good cause existing and due process provided as required by law.

76. Plaintiff enjoyed a property interest in their employment, wages, and benefits attendant to the employment that is secured under the Fourteenth Amendment to the United States Constitution, law, rule or regulation.