IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN MORZINE, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 18-2174 |
| | : | |
| PHILADELPHIA HOUSING AUTHORITY, et al. | : : | |

**MEMORANDUM**

**Chief Judge Juan R. Sánchez**                                            **October 6, 2021**

Plaintiff John Morozin filed this employment discrimination action against the Philadelphia Housing Authority ("PHA"), Joanne Strauss, and Branville Bard, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, the Fair Labor Standards Act ("FLSA"), the Pennsylvania Human Rights Act ("PHRA") and the Philadelphia Fair Practices Ordinance ("PFPO"). Morozin alleges wrongful termination on the basis of race and retaliation. Defendants now move for summary judgment. Because Morozin has failed to establish a prima facie case on either count, the Court will grant the motion and enter judgment in Defendants' favor.

**FACTS[1]**

Morozin, who is white, was a Philadelphia Housing Authority Police Department ("PHAPD") employee until June 16, 2016, when he was terminated. *See* Pl.'s Mot. for Summ. J. Ex. K. Morozin served as a Patrol Officer from February 2013 until August 2015, and was selected for the Crime Suppression Unit. During an initial meeting, PHAPD Inspector Thompson presented

---

[1] The following facts are drawn from documents in the record and the Parties' respective undisputed statements of fact. The facts detailed herein are undisputed, except where specifically noted to the contrary.

on the attire and presentation of PHAPD officers, which led Morozin to ask "are we a police department, or are we going to play police department" in front of the attendees. Defs.' Ex. B, at 59:10–63:15. Inspector Thompson dismissed Morozin from the meeting, changed his shift to the midnight shift and assigned him the "booth" assignment for several weeks out of what Morozin alleges was punishment for this comment. *See* Pl.'s SUMF, ECF No. 65 ¶ 98; *see also* Pl.'s Ex. A, at 51:24–25, 52:1–11, 55:17–25, 56:1–5, 57:16–18, 59:10–25, 60:1–4.[2]

Morozin also served as President of PHA's Fraternal Order of Police Union from 2014 to 2015 and thus had exposure to complaints from other officers, including some white officers who felt they were subjected to harsher treatment than two Black officers (Officers Robinson and Bayliss), who "were habitually late, [and] that sicked-out, to the point that their sick time was in the negative." *See* Pl.'s Ex. A, at 35:01–36:25. Morozin advised several officers to bring their complaints to PHA's Human Resources Department. *See* Pl.'s Ex. A, at 33:4–20, 39:20–25, 36:1–19. When Morozin asked Strauss and others about the complaints, he was told the complaints were being looked into but was not given any further information. *See id.* at 40:8–25, 41:1–3. Morozin raised this with a lieutenant and was told to "stay in his lane" and raise the issue with Human Resources. *See id.* at 47:1–25, 48:1–25. After Morozin himself reached the rank of lieutenant, he had conversations with Bard about these complaints and the alleged disparate treatment, saying, "if these were different officers, under a different set of circumstances they would be given more

---

[2] Plaintiff's Statement of Facts alleges "[t]ellingly, Thompson admitted race was a factor in punishing Mr. Morozin . . ." and justified his actions "by falsely accusing Mr. Morozin of making racially-insensitive comments." *See* Pl.'s SUMF, ECF No. 65 ¶¶ 102–03. The record supports Morozin's claim that Thompson accused Morozin of making racially insensitive comments, including saying the "n-word," but the record does not support the claim that "Thompson admitted race was a factor." *See* Pl.'s Ex. A, at 57:16–18, 58:9–11, 67:24–25, 68:1–21.

benefit of the doubt." *See* Pl.'s Ex. A, at 93:19–23, 93:24–25, 94:1–17. Morozin nonetheless claims he "never came out and said [] Black officers are getting treated better than white officers." *Id.*

Morozin was promoted to lieutenant on July 30, 2015. *See* Defs.' Ex. A ¶¶ 15, 20; Defs.' Ex. C. Defendant Branville Bard approved the promotion. *See* Pl.'s Ex. E, at 28:13–15, 30:19–22. As a PHAPD lieutenant, Morozin was responsible for management and supervision of sergeants and patrol officers, training and guidance, and enforcement of all directives. *See* Defs.' Ex. D. During the relevant time period, Bard was the Chief of Police and Director of Public Safety, and Defendant Joanne Strauss was the Executive Vice President of Human Resources for the PHA. *See* Defs.' Ex. F, at 11:18–12:09; Defs.' Ex. G, at 14:23–15:09.

Morozin was not the only lieutenant in the PHAPD. Around the same time as Morozin's promotion, Sean Artis, Geraldine Coleman, and Stephen Cassidy were also hired as lieutenants by Bard. *See* Pl.'s Ex. E, at 50:24, 51:1–5, 54:23–24, 55:1–3. Richard Lesinski served as a lieutenant from March 2015 through the time of Morozin's termination. *See* Defs.' Ex. H, at 20:03–20:19.

Geraldine Coleman was promoted to the rank of lieutenant on August 7, 2015. *See* Defs.' Exhibit V, at 1–2. Coleman was demoted eight weeks later, on October 7, 2015. While serving as a lieutenant, Coleman would at times be required to cover the patrolling duties and/or patrol squad of another sergeant or lieutenant if additional coverage was required, but she did not regularly run a patrol squad, as the other four lieutenants did. *See* Pl.'s Ex. C, at 57:01–25, 58:1–12; *see also* Pl.'s Ex. E, at 61:17–24, 62:1–7. Lieutenant Coleman's everyday responsibilities were instead more administrative in nature rather than operational.[3] While Morozin admits other

---

[3] Morozin denied that Coleman's position was more administrative. *See* Pl.'s SUMF, ECF No. 65 ¶¶ 58–61. While, as detailed above, the citations to the record support that Coleman would *at times* perform the same duties as other lieutenants, the same sections of the record also support Coleman serving in a more administrative role than the other four lieutenants.

3

PHAPD officers did not view Coleman to be an authority figure, he alleges they "respected [him] for his commendable performance and ability to serve." *See* Pl.'s SUMF, ECF No. 65 ¶ 66.

Morzin alleges Lieutenant Sean Artis, who is Black, struggled to follow the procedures for obtaining warrants and managing crime scenes. *See* Pl.'s Ex. A, at 142:3–17, 143:1–6. Bard moved Lieutenant Artis from patrol duty to the radio room and did not terminate him. *Id.*

In his role as a lieutenant, Morozin was responsible for addressing the performance of his subordinates, including Sergeant Abdul Evans, who is Black. *See* Defs.' Ex. U ¶ 4; *see also* Defs.' Ex. F, at 109:8–109:11; 110:01–110:22. Morozin alleges he reprimanded Evans, verbally counseled him on his performance, and repeatedly suspended him in an effort to rectify his performance issues. *See* Pl.'s Ex. A, at 85:17–25; 86:1–25; 87:1–11. Morozin did not prepare or issue a performance improvement plan. *See* Defs.' Ex. U ¶ 4. Bard demoted Evans on September 16, 2016. *See* Defs.' Ex. F, at 109:21.

On September 4, 2015, Chief Bard issued a memorandum to all PHAPD personnel, outlining the PHAPD interpretation of the statutory jurisdiction of the PHA's police function. *See* Defs.' Ex. T. Morozin had conversations with Bard and other members of PHA's leadership regarding the jurisdictional directive, and he brought his subordinates' disapproval of the directive to Bard's attention.[4] *See* Pl.'s SUMF ¶ 42, ECF No. 65. Morozin expressed to his subordinates and Bard directly that he was going to follow the order.[5] *See id.* ¶ 43; *id.* Ex. A, at 184:17–25, 185:1–5, 185:15–25, 186:1, 186:11–14.

---

[4] This fact is derived from Morozin's admission in part of the *Defendants' Undisputed Statement of Facts*. *See* Pl.'s SUMF ¶ 42. Construing the facts in the light most favorable to Morozin, the Court adopted Morozin's partial admission of the facts on this point.

[5] This fact is derived from Morozin's admission in part of the *Defendants' Undisputed Statement of Facts*. *See* Pl.'s SUMF ¶ 42. Construing the facts in the light most favorable to Morozin, the Court adopted the Plaintiff's statement of the facts on this point.

As a lieutenant, Morozin was the subject of two Complaints Against Police. Both resulted in a finding of "unsubstantiated." *See id.* Ex. G. Bard stated these complaints were problematic in his memorandum describing his reasons for terminating Morozin. *See* Defs.' Ex. U ¶ 3.

During one shift, nearly all the members of Morozin's platoon called out sick. *See* Defs.' Ex. U ¶ 5. Bard believed this to be a "sick out." *Id.* Stacy Thomas of the Human Resources Department conducted an investigation and stated, "none of [those interviewed] attributed their call out to Mr. Morozin." *See* Pl.'s Ex. F, at 90:17–93:22.

Shortly before Morozin's termination, Bard learned Morozin had failed to initially carry out a valid and lawful order given by his supervisor, Inspector Collier, although Collier attributed the first few instances to communication errors and misunderstandings. Defs.' Ex. U ¶ 6. When Inspector Britt was informed of Morozin's deficiencies, the order was subsequently followed.[6] *Id.*

PHA's Human Resources Department, meanwhile, was made aware by several employees, including Morozin, that overtime hours were not being paid correctly in 2015. *See* Defs.' Ex. N; Defs.' Ex. M, at 95:08–97:21. Morozin brought his concerns regarding unpaid wages to Bard and Human Resources' attention and began to elevate these complaints. *See* Defs.' Ex. B, at 177:05–177:07; *id.* In September and October 2015, Morozin contacted Joshua McQuoid, the Manager of Compensation and Benefits, regarding the unpaid overtime. *See* Defs.' Ex. Q. On April 16, 2016,

---

[6] Morozin denied this fact and stated, "Defendant Bard admits that any error may have been due to miscommunications and that Mr. Morozin did in fact carry out the orders of his superior." In support of their denial, they cited to Defendants' Exhibit U at ¶ 6. The record reflects Inspector Collier informed [Bard] that he attributed "the *first* few" occasions to communication errors and misunderstandings but "noted that in each case the order was carried out after another inspector, Inspector Britt, was informed of the failure." *Id.* (emphasis added). The Court has viewed the facts in the light most favorable to the Plaintiff, and added relevant context, without adopting Plaintiff's overstatement of the record.

5

Morozin contacted McQuoid regarding further unpaid overtime and a uniform allowance reimbursement. *See* Defs.' Ex. R.

When McQuoid did not respond, Morozin emailed him on April 23, 2016, and again on May 7, 2016. Morozin informed McQuoid that he still had not been paid and provided further dates for which he was owed payment. *Id.* On May 22, 2016, Morozin advised Zach Rodgers (PHA's Office of Audit and Compliance) that PHA owed him roughly $5,000 in unpaid overtime and asked him to look into the issue. *Id.* Simultaneously, Morozin contacted McQuoid and explained that if his complaint was not addressed in the near future, he would have to take it outside of PHA for resolution. *Id.* The very next day, McQuoid and Jenny Yang contacted Morozin, and informed him that total compensation would be paid on May 27, 2016. *Id.* On May 27, 2016, Morozin advised McQuoid that he was still owed a $450 uniform maintenance check, and nine days later he advised Pinkney he was still missing pay for fifteen hours of regular time. *Id.*

At the time, Chief Bard was aware of complaints from several other officers regarding unpaid hours or overtime and testified that the overtime payment issue was chronic. *See* Defs.' Ex. F, at 69:6–12; Pl.'s Ex. E, at 86:7–10. Bard acknowledged he was not aware of anyone who was underpaid by nearly $5,000. *See* Pl.'s SUMF ¶ 32, ECF No. 65.

Morozin was terminated effective June 16, 2016. *See* Defs.' Ex. E. During his tenure at the PHAPD, Morozin was an "at-will" employee of the PHA. *See* Defs.' Ex. L. Bard made the decision to terminate Morozin and articulated to Strauss that Morozin was a "disruption" to the department. *See* Defs.' Ex. G, at 83:05–83:19. Strauss, who is a lawyer, disagreed with Bard's decision to fire Morozin, and expressed concern that Bard's proposed termination of Morozin was in close temporal proximity to Morozin's complaints regarding unpaid overtime. *Id.* at 26:09–26:13; 84:09–84:19. Bard still chose to fire Morozin. *See* Defs.' Ex. U.

**DISCUSSION**

Morozin has failed to establish a prima facie case of race discrimination. He has also failed to prove Defendants' legitimate nondiscriminatory reasons for his termination were, in fact, pretextual. Morozin has not established a causal connection between his termination and a protected activity. Because there is no genuine dispute as to any material facts and Defendants are entitled to judgment on the discrimination and retaliation claims, the Court will grant the motion.

A motion for summary judgment shall be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To defeat summary judgment, "the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (alteration in original) (citation and internal quotation marks omitted). In considering a motion for summary judgment, "a court does not resolve factual disputes or make credibility determinations, and must view facts and inferences in the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Inc., v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995). Nonetheless, "an inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). In employment discrimination cases, "the summary judgment

standard is 'applied with added rigor' because 'intent and credibility are crucial issues.'" *Stewart v. Rutgers State Univ.*, 120 F.3d 426, 431 (3d Cir. 1997).

Morozin has failed to establish a prima facie case of race discrimination. Title VII, PHRA, PFPO, and §1981 race discrimination claims are examined under the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (Title VII); *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (PHRA); *Glover-Daniels v. 1526 Lombard St. SNF Operations LLC,* No. 11-5519, 2012 U.S. Dist. LEXIS 98311, *16 (E.D. Pa. July 16, 2012) (PFPO); *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009) (§ 1981).

A plaintiff bears the burden of establishing a prima facie case of race discrimination by a preponderance of the evidence. *Sarullo v. United States Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 702, 802 (1973)). This raises a rebuttable presumption of discrimination. The burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the defendant carries this burden, the presumption of discriminatory action is rebutted, and the plaintiff must then establish by a preponderance of the evidence that the "employer's proffered reasons were merely a pretext for discrimination." *Texas Dep't of City. Affairs v. Burdine*, 450 U.S. 248, 253–55 (1981).

A prima facie case of race discrimination requires a plaintiff to show: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably *or* the adverse action occurred under circumstances that raise an inference of discrimination. *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006) (emphasis added).

Morozin has failed to meet the fourth requirement. Although Morozin raises several examples of what he considers to be disparate treatment on the basis of race, the record does not support Morozin's opinion.

First, Morozin cites the circumstances surrounding his dismissal from the Crime Suppression Unit. In that instance, Morozin expressed his frustration with Inspector Thompson's focus on presentation and attire at a meeting by stating "are we a police department, or are we going to play police department" in front of attendees. Inspector Thompson dismissed Morozin, changed his shift to the midnight shift, and gave him the "booth" assignment for several weeks. Despite Morozin's assertion that removal from the unit was disparate "from how [Thompson] treated Black officers," he does not provide any evidence that this punishment was because of his race rather than his insubordination. He also does not provide any evidence of instances where Black officers made similar statements and were allowed to remain in the Unit.

Second, Morozin highlights the alleged fact that other Caucasian officers informed him they felt they were being treated unfairly due to their race, and that they were being disciplined more harshly than two female Black officers who used sick leave more often and were frequently tardy. The only complaint recalled specifically was that Officer Manning complained that he felt the Black officers, including Robinson and Bayliss, would have their tardiness excused, while Caucasian officers were levied discipline for the same infraction. *See* Pl.'s SUMF ¶¶ 108–114, ECF No. 65. According to the record, Officer Manning stated that for these Black officers, "their tardiness was excused. And the white officers would be counseled or disciplined or threatened with discipline for tardiness." *See* Pl.'s Ex. A, at 35:22–25. Morozin later clarified that, "[w]ith the tardiness and the absenteeism, those two officers . . . were used as examples of using their sick time all the time." *See id.* at 38:1–20.  However, Morozin does not allege a single concrete and

9

specific instance of a white officer being punished for tardiness when an Black officer was not, nor does he allege Officer Manning himself was punished for being tardy—merely that Officer Manning and others "felt" as if Caucasian officers broadly were being unfairly punished.

Third, Morozin alleged that Bard hired Stephen Cassidy, and that the allegations against Cassidy "would certainly prohibit a Caucasian officer from being hired." *See* Pl.'s Br. 9, ECF No. 65-1. Morozin fails to provide an example of a Caucasian officer who applied with similar allegations and was not hired. Instead, Morozin asserts that Bard stated, "this place needs to be darkened up." However, Morozin acknowledged that this assertion is based on "a rumor that was going around about [Bard] making [said] statement . . ." and he had "heard the rumor" but "did not hear him say it firsthand." *See* Defs.' Ex. BB, at 77:05–77:08.

Fourth, Morozin alleges that Bard instituted discriminatory hiring practices to bring in "predominantly Black police officers, promoted less-qualified and less senior Blacks, and disproportionally disciplined Caucasian officers." *See* Pl.'s Br. 9, ECF No. 65-1. However, Bard implemented a PHA initiative to hire more officers of the PHAPD who were residents of PHA communities. Under *Doe v. Lower Merion School District*, when an initiative is racially neutral on its face, absent some showing that there was an *intent to discriminate*, a disparity in hiring is not sufficient to raise an inference of race discrimination. 665 F.3d 524, 546 (3d Cir. 2011) (emphasis added). Morozin fails to make that showing here.

Fifth, Morozin points to several individuals whom he alleges are comparators who received more favorable treatment. To make an "inference of discrimination requires evidence that a similarly situated employee outside the protected class was treated more favorably." *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998). While it is true this "does not necessarily mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.'" *Opsatnik*

10

*v. Norfolk S. Corp.*, 335 F. App'x 220, 222–23 (3d Cir. 2009). Such a showing frequently requires "that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Id.* at 223. It is clear Morozin relies on individuals who were not similarly situated to him and/or did not receive more favorable treatment. The Court addresses each in turn.

Morozin argues Lieutenant Coleman is a comparator who received favorable treatment. However, as Morozin himself testified, "Coleman was assigned to administration." *See* Pl.'s Ex. A, at 108:01–17. Coleman did not have a designated platoon or patrol squad, although she would supervise one if coverage was required. *See* Pl.'s SUMF ¶¶ 58–65, ECF No. 65. Instead, Coleman was responsible for scheduling, certification records, coordinating with mobile communications and city police, and vendor work. This is significantly different than Morozin's responsibilities, which were concentrated on supervising a patrol squad and platoon. Morozin cites only the fact that the two shared the same title, and he fails to refute these differences. Coleman is not an adequate comparator for Morozin.

Morozin also asserts that Sergeant Evans, his inferior officer, is another comparator. Not so. Evans was supervised by Morozin, was a lower rank, and had different responsibilities. The fact that Evans was demoted instead of terminated is thus irrelevant.

Nor is Shawn Artis a comparator engaged in similar conduct. While Artis was a lieutenant, who allegedly struggled with performance and was eventually moved to the radio room, Morozin has not shown that he received the same Complaints Against Police, had inferior officers sleeping on the job, or was accused of insubordination, as Morozin was. As a result, Morozin and Artis had not engaged in similar alleged misconduct.

The Court finds Morozin fails to show a prima facie case for race discrimination.[7]

---

[7] Furthermore, Defendants have met their burden to set forth a legitimate and non-discriminatory reason for Morozin's termination, including: "1) Plaintiff's actions which were deemed not conducive to the PHAPD's mission of fostering a community-policing culture; 2) openly and repeatedly challenging his Chief's directive regarding the jurisdictional limits of PHAPD authority, and likewise sharing his disagreement with subordinate members of his platoon; 3) multiple accusations of "immoderately" handing citizens and use of excessive force by members of the community; 4) failure to bring a subordinate employee's performance to acceptable standards; 5) organizing a "sick out," wherein nearly all members of Plaintiff's platoon called out of work sick, leaving only one (1) employee available to protect the residents of PHA; 6) failure to follow the lawful and valid order of his direct supervisor; and 7) engaging in the aforementioned conduct, as a higher-ranking member of the department with many years of experience, in the view of impressionable members of his platoon." *See* Defs.' Mot. for Summ. J., ECF No. 63, at 18.

Defendants are correct that poor attitude, failure to adequately supervise a subordinate employee, and insubordination have all been recognized by this Court as legitimate and non-discriminatory reasons for termination. *See Chipollini v. Spencer Gifts*, 814 F.2d 893, 896 (3d Cir. 1987). As such, the burden shifts back to the Plaintiff, who "must demonstrate such 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable fact-finder could rationally find them unworthy of credence, and hence infer that the employer did not act of the asserted non-discriminatory reasons." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)."To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* This court cannot and will not substitute its business opinion for that of the PHAPD.

While Morozin demonstrates weaknesses in several of Defendants' proffered reasons for termination, that is insufficient to satisfy his burden. Several reasons remain. As an at-will employee, Morozin is subject to termination for his failure to adequately discipline and supervise Evans, and the record fails to cast any doubt on the articulated reason or that this decision is a mere pretext for racial animus. While Morozin could have undermined this justification in a multitude of ways, many of which being less exacting, he also failed to articulate an example of a Black officer being retained while failing to adequately supervise and improve the performance of a subordinate. By his own testimony, Morozin had "counseled [Evans] informally, when [he] caught [Evans] sleeping" but did not put anything on paper until Evans ignored a direct order, despite Evans "habitually sleeping on duty." *See* Pl.'s Ex. A, at 85:17–25, 86:1–25, 87:1–25. Morozin fails to cast any reasonable doubt on this reason for termination. Morozin is also subject to termination for failing to follow the order of a superior officer *the first time it was given*, even if, construing the facts in the light most favorable to Morozin, it was an instance of miscommunication or the order was eventually followed. Had Morozin shown evidence of an officer of his standing failing to follow multiple orders, even if it was due to a miscommunication, and being retained he would have cast some doubt or implausibility as to the veracity of Defendants' reason for termination. But he has not. Morozin has thus failed to establish that Defendants' proffered reasons for termination are mere pretext.

Morozin also fails to establish a prima facie claim of retaliation. The FLSA makes it unlawful to "discharge . . . any employee because such employee has filed any complaint." 29 U.S.C. § 215(a)(3). "To establish a prima facie case, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Berrada v. Cohen*, 792 F. App'x 158, 164 (3d Cir. 2019); *See also Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); 29 U.S.C. § 215.

The first and second prongs have been met. Making a complaint is protected employee activity, and Morozin was fired after complaining about unpaid wages. Regarding the third prong, Morozin alleges he was terminated in retaliation for his complaints regarding PHA's failure to pay him overtime and other wages. *See* Defs.' Ex. A ¶¶ 65–70. Under *Farrell v. Planters Lifesavers Co.*, a plaintiff can "establish causation/pretext by showing: (1) temporal proximity between the protected activity and adverse action; (2) a pattern of antagonism after the protected act; (3) the reason for his alleged adverse action is pretextual; or (4) the record taken as a whole supports an inference of discrimination." 206 F.3d 271, 280 (3d Cir. 2000).

In *Jalil v. Avdel Corp.*, the Third Circuit recognized that a temporal proximity of two days is sufficient to establish causation. 873 F.2d 701, 708 (3d Cir. 1989). Here, the parties dispute what dates should be utilized to determine temporal proximity. Morozin alleges he complained on June 5, 2016. *See* Pl.'s SUMF ¶ 22, ECF No. 65. Construing the facts in Morozin's favor, the Court will use June 5, 2016.

Morozin alleges ten days elapsed between the final complaint and his termination. *Id.* at 21. This is not close enough to alleviate the need for a casual nexus. Morozin points to Strauss's concern about the temporal proximity of the termination, her disagreement with the decision, and

13

the fact that Bard called Morozin a "disruption" to create an inference of discrimination. This ignores Strauss's statement that Bard never discussed or expressed concerns with Morozin's employment due to his continued complaints about pay and benefits. *See* Pl.'s Ex. F, at 83:20–24, 84:1–24. Morozin also ignores the numerous other officers who raised complaints that they had not been paid appropriately and that Bard and the PHA were aware of these complaints. *See* Defs.' Mot. for Summ. J. ¶¶ 32-36, ECF No. 63 (citing Exhibit "N"; Exhibit "M" at 95:08–95:21; 96:25–97:21; Exhibit "H" at 32:16–36:17); *see also* Exhibit "F" at 69:6–69:12; Exhibit "CC" at 78:15–78:17. Morozin fails to provide any evidence or even an explanation for why he was fired for his complaints while other individuals were not. Morozin also fails to cast any doubt on several of Defendants' proffered reasons for termination, as discussed *supra*. Because Morozin failed to establish the causal connection requirement, Defendants are entitled to judgment on his retaliation claim.

**CONCLUSION**

Morozin has failed to establish a prima facie case for discrimination and has not proven Defendants' legitimate nondiscriminatory reasons for his termination were pretextual. Morozin has also failed to establish a prima facie case of retaliation. Defendants are thus entitled to judgment on both counts. There being no genuine dispute as to any material facts, the Court will grant the motion and enter judgment in Defendants' favor.

An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.